# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ELAINE MCREYNOLDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 C 5642 |
| ) | |
| NANCY A. BERRYHILL, Acting ) | Magistrate Judge Jeffrey Cole |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Elaine McReynolds, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Ms. McReynolds asks the Court to reverse and remand the ALJ's decision, and the Commissioner seeks an order affirming the decision. For the reasons set forth below, the ALJ's decision is affirmed.

## INTRODUCTION

Ms. McReynolds was born on December 22, 1956 and has a history of insulin dependent diabetes, obesity, low back pain, hypertension, hypothyroidism, and depression. She obtained a GED in 1988 and previously worked as a baggage handler at O'Hare Airport. Ms. McReynolds alleges that she became totally disabled on April 10, 2010 due to diabetes, depression, sciatica, low back problems, bronchitis, hyperthyroidism, glaucoma, and hypertension. Ms. McReynolds' insured status for DIB purposes expired on March 31, 2016, which means she had to show she was disabled on or before that date to be eligible for DIB. *Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012).

Under the standard five-step analysis used to evaluate disability, the ALJ found that Ms. McReynolds had not engaged in substantial gainful activity since her alleged onset date of April 10, 2010 (step one) and her obesity, hyperlipidemia, diabetes mellitus, hypothyroidism,

hypertension, and Graves' disease were severe impairments (step two). (R. 20). The ALJ determined that Ms. McReynolds' diabetes, hypertension, and thyroid disorders did not qualify as a listed impairment (step three). *Id.* at 22-23. The ALJ concluded that Ms. McReynolds retained the residual functional capacity ("RFC") to perform medium work (i.e., "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" and "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."), *see* 20 C.F.R. §§ 404.1567(c); 416.967(c), except that she was limited to only frequent operation of foot controls bilaterally, occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs, stooping, crouching, kneeling, and crawling; and no concentrated use or exposure to moving machinery and unprotected heights. *Id.* at 23.

Given this RFC, the ALJ concluded that Ms. McReynolds was unable to perform her past relevant work as a baggage handler. (R. at 31). At step five, the ALJ found that Ms. McReynolds could perform other jobs that exist in significant numbers in the national economy, such as bagger, sandwich maker, and dining room attendant. *Id*. at 32. The Appeals Council denied Ms. McReynolds' request for review on June 9, 2017. *Id*. at 1-6. Ms. McReynolds now seeks judicial review of the final administrative decision of the Commissioner, which is the ALJ's decision. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

**ANALYSIS**

**1.**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings

2

found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2012); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2012). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (*quoting Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, an ALJ's credibility determination should be upheld "unless it is patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

The ALJ denied Ms. McReynolds' claim at step five of the sequential evaluation process, finding that she had retained the residual functional capacity to perform a significant number of unskilled medium jobs in the national economy. Ms. McReynolds challenges the ALJ's decision on two main grounds: (1) the ALJ improperly assessed her subjective symptom allegations and (2) the ALJ erred in determining Ms. McReynolds can perform a range of medium-exertional work. The arguments are addressed below.

3

## A.

## The ALJ's Symptom Evaluation

### 1.

Ms. McReynolds argues that the ALJ's credibility determination discounting the severity of her subjective symptoms was patently wrong because the ALJ 1) improperly considered her noncompliance with treatment recommendations, 2) impermissibly played doctor by failing to rely on a medical opinion to support his assessment of her subjective assertions, 3) ignored her hypothyroidism, and 4) improperly rejected her assertion that she could not consistently afford her diabetes medications. The Court finds that the ALJ's evaluation of Ms. McReynolds' subjective symptoms is supported by substantial evidence and that no legal error was committed.

Ms. McReynolds' first argument is that the ALJ erroneously discounted her credibility regarding the severity of her symptoms based on her noncompliance with diabetes treatment recommendations. The regulations quite sensibly provide that "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2016 WL 1119029, at *8 (March 16, 2016). The ALJ found that Ms. McReynolds' alleged symptoms and limitations were not fully consistent with the weight of the evidence in the record. (R. 24). The ALJ noted that Ms. McReynolds' diabetes was generally well controlled with routine and conservative treatment, including insulin, diabetic medication, and an effort to monitor and control carbohydrate intake. *Id*. The ALJ noted that, not surprisingly, Ms. McReynolds' allegations of fatigue and tiredness generally occurred when her blood sugars were uncontrolled and she was not complying with diet or medication. *Id*.

The ALJ noted, for example, that in early 2012, Ms. McReynolds complained of significant fatigue when her blood sugar levels were not well controlled and she was not following prescribed treatment. (R. at 24, 359). By mid-2012, Ms. McReynolds was "working very hard on her carb consumption," and her diabetes was "[w]ell controlled." *Id*. at 350. The ALJ pointed out that by

the end of 2012, Ms. McReynolds' condition improved when she controlled her diet and began treatment of her hyperthyroidism, a condition which affected her blood sugar levels. *Id*. at 24, 293, 296. As another example, the ALJ noted that Ms. McReynolds' episodes of hypoglycemia, which she reported left her unable to do anything, were addressed when she learned to match her insulin dosage to her food intake. *Id*. at 24, 445. Based on this evidence, the ALJ concluded that if Ms. McReynolds "were to follow her physician's orders with the same degree of diligence she had in the past, the record supports the conclusion that her symptoms would be better controlled." *Id*. at 24. The ALJ therefore found Ms. McReynolds' allegation that her condition had not changed since her alleged onset date inconsistent with the record evidence, which demonstrated that her condition improved and her symptoms were better controlled when she followed her physician's recommendations. *Id*.

Ms. McReynolds contends that the ALJ improperly considered her noncompliance with her diabetes diet and medication in deciding she was not disabled. Ms. McReynolds relies on Social Security Ruling ("SSR") 82-59 and Social Security regulation 20 C.F.R. § 404.1530, which provides that "[i]n order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." 20 C.F.R. § 404.1530(a); *see also* 20 C.F.R. § 416.930(a*). A "disabled person cannot qualify for benefits if she refuses to follow a prescribed course of treatment that would eliminate the disability." Pesek v. Apfel*, 215 F.3d 1330, at *3 (7th Cir. 2000)(Emphasis supplied).

In this case, the ALJ properly analyzed Ms. McReynolds' failure to follow her diabetes treatment regimen. The ruling and regulations cited by Ms. McReynolds that govern a failure to follow prescribed treatment do not apply to Ms. McReynolds' case. SSR 82-59 only applies to individuals with a "disabling impairment" that precludes them from engaging in any substantial gainful activity. SSR 82-59, 1982 WL 31384, at *1 (1982); *see also* 20 C.F.R. §§ 404.1530(a) & 416.930(a). SSR 82-59 provides that an "individual who would otherwise be found to be under a disability but who fails without justifiable cause to follow treatment prescribed by a treating source

5

which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." SSR 82-59, 1982 WL 31384, at *1.

The ALJ did not find that Ms. McReynolds was disabled and that she would not be disabled if she complied with her diabetes treatment. Instead, the ALJ found that Ms. McReynolds' condition improved if she followed her diabetes treatment regimen. The ALJ stated: "this is not to say that the claimant is asymptomatic, or even that the claimant would be completely asymptomatic if she followed the directions of her physicians to the letter." (R. 25). The ALJ continued that if Ms. McReynolds was "asymptomatic, the undersigned would have found her impairments to be non-severe. Rather, complete control of her conditions is unlikely to be achieved, even with good diligence over the treatment regimen necessary to achieve good control over her diabetes, hyperthyroidism, hyperlipidemia, and other impairments. However, with that said, even with only partial control, by her own report, to treating sources, her condition improves." *Id*. There is substantial evidence that when followed, the diabetes treatment regimen Ms. McReynolds was prescribed was successful in better controlling her diabetes. Therefore, the ALJ did not err in considering how Ms. McReynolds' condition improved during periods when she followed recommended treatment. Since the ALJ did not find Ms. McReynolds disabled and then deny benefits because she did not follow a prescribed treatment plan that would restore her ability to work, the ALJ did not violate SSR 82-59 or misuse the noncompliance regulations.

**2.**

Ms. McReynolds' second argument is that the ALJ impermissibly played doctor by assessing her subjective assertions without a medical opinion**.** Ms. McReynolds asserts that the ALJ offered his own independent medical opinion when he determined that "all of Ms. McReynolds' diabetic symptoms result from non-compliance with the prescribed diet or medication regime" because there is no medical opinion in the record supporting this finding. (Doc. 23 at 8). We reject Ms. McReynolds' argument on this point because the ALJ did not find

6

that all of Ms. McReynolds' diabetic symptoms result from noncompliance. Rather, the ALJ reached the exact opposite conclusion, finding that Ms. McReynolds would not be "completely asymptomatic [even] if she followed the directions of her physicians to the letter." Quite the contrary. The ALJ found that "complete control of her conditions is unlikely to be achieved, even with good diligence over the treatment regimen necessary to achieve good control over her diabetes, hyperthyroidism, hyperlipidemia, and other impairments." (R. 25). Because the ALJ did not play doctor or develop his own medical opinions in assessing Ms. McReynolds' symptoms by observing that Ms. McReynolds would not be completely asymptomatic if she followed her prescribed diet and medication regime, her second argument is without merit.

**3.**

Ms. McReynolds next asserts that the ALJ ignored the effect of her hypothyroidism and Graves' disease on her fatigue levels in his subjective symptom analysis, focusing solely on her diabetes and treatment compliance. But, the ALJ acknowledged and discussed Ms. McReynolds' hypothyroidism and Graves' disease at several points in his decision. The ALJ first considered Ms. McReynolds' hypothyroidism and Graves' disease at step two, finding them to be severe impairments. (R. 20). In assessing Ms. McReynolds' RFC, the ALJ considered the effect of Ms. McReynolds' hypothyroidism and Graves' disease on her fatigue levels by giving her "allegations of fatigue, tiredness, and weakness some benefit of the doubt." *Id*. at 30. There is no requirement that the ALJ repeat the same factual analysis of this evidence in his credibility determination. *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed. Appx. 674, 678 (7th Cir. 2010) (the Court reads the ALJ's decision as a whole and the ALJ is not required to create "tidy packaging" throughout his decision); *see* also *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)("It is proper to read the ALJ's decision as a whole" and "would be a needless formality to have the ALJ repeat substantially similar factual analyses" in multiple parts of the decision). Reading the ALJ's decision as a whole, the ALJ adequately considered the impact of Ms. McReynolds' hypothyroidism and Graves'

7

disease on her fatigue levels and did not err in failing to specifically include the fatigue effect of these conditions in the credibility part of his decision.

**4.**

Ms. McReynolds next challenges the ALJ's determination regarding her credibility, arguing that the ALJ rejected her testimony that she had difficulty affording her medication as an explanation for her irregular diabetes medication compliance. The administrative law judge was not obliged to believe all her testimony. Indeed, credibility determinations of an ALJ are given special deference. *Castille v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). Reviewing courts should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported. *Metzger v. Astrue*, 263 Fed.Appx. 529, 533, 2008 WL 397578, 4 (7th Cir. 2008). *See also Alvarado v. Colvin*, 836 F.3d 744 (7th Cir. 2016). It must not be forgotten that the ALJ, not the reviewing court, is in the best position to evaluate credibility having had the opportunity to observe the plaintiff testifying during the hearing. *Castille*, 617 F.3d at 928.

An "ALJ may deem an individual's statements less credible if the medical reports or records show that the individual is not following the treatment as prescribed." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). "[I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2016 WL 1119029, at *8.

At the administrative hearing, the ALJ may need to "ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." *Id.*; *see also Shauger*

*v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("[a]lthough a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). "An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'" *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). *See also Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (noting that "the agency has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment."). *See also SSR 16-3p,* 2016 WL 1119029, at *9.

Here, the ALJ satisfied his duty under SSR 16-3p by expressly considering Ms. McReynolds' alleged financial limitations in his decision. He did not, however, find Ms. McReynolds' argument persuasive: "[a]lthough the claimant raised financial concerns regarding her ability to consistently get her medications, she did not report such difficulties to her treatment providers; therefore, the undersigned does not find that this is a good excuse for poor, or incomplete, compliance." (R. 28-29).

As we have noted, the ALJ was not required to credit unquestioningly Ms. McReynolds' testimony about her inability to afford medication. Rather, an ALJ is only required to "consider explanations for instances where [a claimant] did not keep up with her [diabetes] treatment," not to accept all explanations. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); SSR 16-3p, 2016 WL 1119029, at *9 ("we will consider and address reasons for not pursing treatment that are pertinent to an individual's case."). A contrary rule would effectively eliminate the ALJ's role as a fact finder and require that a fact finder blindly accept an applicant's testimony. That, of course, is the antithesis of the ALJ's role in Social Security cases.

The ALJ in this case properly considered whether Ms. McReynolds' testimony was credible and whether the evidence supported her claim, including assessing whether there were notations in her treatment record corroborating her testimony that she could not afford medication. *Cf. Craft*, 539 F.3d at 679 (holding ALJ erred when she "drew a negative inference as to Craft's

credibility from his lack of medical care" but did not "note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."); *Regennitter v. Commissioner of Social Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999) (criticizing ALJ's rejection of a claimant's complaints for lack of treatment "when the record establishes that the claimant could not afford it" and finding the record contained such corroborating evidence). By contrast, Ms. McReynolds' assertion that she failed to obtain diabetes medication due to lack of funds is uncorroborated by any evidence in the record. The ALJ was not obligated to blindly and unquestionably credit Ms. McReynolds' explanation where the record shows she never expressed a financial difficulty to treating providers who could have helped her obtain medication. SSR 16-3p, 2016 WL 1119029, at *9 (stating "[w]e will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them.").[1]

In the absence of corroborating treatment notes documenting financial difficulties, the ALJ reasonably rejected Ms. McReynolds' testimony about her inability to afford medication as an excuse for her lack of consistent compliance. Because the ALJ fully and properly considered Ms. McReynolds' claimed reason for not consistently taking her diabetes medication, his credibility determination is not patently wrong and should not be disturbed.

## B.

## The ALJ's Residual Functional Capacity Determination

---

[1] In other contexts, courts have recognized that while silence is generally so ambiguous that it is of little probative force, it may be significant where it would have been natural for the person to make the assertion that is missing. *Georgia v. South Carolina*, 497 U.S. 376, 389 (1990); 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 1042 at 1058 (James H. Chadbourn rev., 1970).

**5.**

Ms. McReynolds contends that the ALJ's RFC determination with respect to her physical limitations is unsupported by substantial evidence. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (stating "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The ALJ's RFC assessment must incorporate all of the claimant's limitations which he finds are supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

The ALJ concluded that Ms. McReynolds has the severe impairments of obesity, hyperlipidemia, diabetes mellitus, hypothyroidism, hypertension, and Graves' disease. (R. 20). After consideration of the evidence, the ALJ determined that Ms. McReynolds could perform medium work involving only frequent operation of foot controls bilaterally, occasional climbing of ladders, ropes, scaffolds, frequent climbing of ramps and stairs, stooping, crouching, kneeling, and crawling, and no concentrated use or exposure to moving machinery and unprotected heights. (R. 23). Ms. McReynolds raises two challenges to the ALJ's RFC assessment. First, she argues that the ALJ created an evidentiary deficit when he "rejected all opinions of record regarding Ms. McReynolds' physical capacity" and then improperly used his own lay interpretation of the medical evidence. (Doc. 23 at 10). Ms. McReynolds' argument finds no support in either the law or the facts.

Ms. McReynolds' suggestion that the ALJ is required to adopt a single medical opinion as the basis for the RFC is incorrect. An ALJ "must consider the entire record," and "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Rather, it is the role of the ALJ to resolve conflicts in the evidence and to formulate an appropriate RFC based on

consideration of the entire record. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (the determination of RFC "is an issue reserved to the [Commissioner]," based on "the entire record, including all relevant medical and nonmedical evidence" and "if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.").

Ms. McReynolds' contention that the ALJ left an evidentiary deficit by "rejecting all opinions of record regarding [her] physical capacity" is not accurate. (Doc. 23 at 10). The ALJ did not reject the opinions of consultative examiner Dr. Bhavana P. Vaidya and the state agency physicians. The ALJ partially accepted Dr. Vaidya's opinion that Ms. McReynolds had no work-related limitations associated with her impairments and the state agency physicians' opinions that Ms. McReynolds had no severe physical impairment. (R. 30). Though this evidence supports a finding that Ms. McReynolds has no limitations related to her impairments, the ALJ gave Ms. McReynolds' allegations of fatigue, tiredness, and weakness "some benefit of the doubt" and found her more limited than Dr. Vaidya. *Id*. After noting the state agency physicians' opinions that Ms. McReynolds did not have a severe impairment, which received partial weight, the ALJ explained that he reduced Ms. McReynolds to a range of medium work "taking into account the evidence received at the hearing level, and the claimant's allegations." *Id*. Although the ALJ did not fully adopt these physicians' opinions in developing the RFC, he appropriately weighed them against the rest of the evidence. That is his job. Blind acceptance of either side's position is not.

Moreover, the ALJ properly assigned partial weight to Dr. Kameron Matthews' statement, given after only his first visit with Ms. McReynolds. Dr. Matthews stated that Ms. McReynolds was under his care for diabetes, hypertension, hyperlipidemia, hypothyroidism, and depression. (R. 329). Dr. Matthews indicated that Ms. McReynolds "regularly experiences symptoms that affect her daily activities" and asked for accommodation when possible. *Id*. The ALJ explained that Dr. Matthews' statement did not contradict the limitations found in the ALJ's RFC determination. *Id*. at 30-31. Because Dr. Matthews did not provide any medical opinions regarding specific functional limitations related to Ms. McReynolds' impairments, the ALJ

reasonably assigned little weight to Dr. Matthews' statement. (R. 30, 329). Indeed, in *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996), the court emphasized that "[g]iven that Dr. Lloyd failed to venture an opinion as to the extent of Books' limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best."

Finally, the ALJ reasonably rejected the opinion of Ms. McReynolds' treating physician, Dr. Paul Ruestow, because Dr. Ruestow "ignore[d] the section of the form requesting him to provide clinical signs, symptoms, or even a valid diagnosis, to explain the alleged degree of impairment he indicated the claimant experienced." (R. 31, 347). Significantly, the ALJ found in addition, that Dr. Ruestow's opinion was inconsistent with his own treatment records, which revealed that Ms. McReynolds' diabetes was well controlled and was not based on a thorough physical examination "to substantiate the alleged extent of claimant's physical limitations." *Id*. at 31, 350. The ALJ also explained that Dr. Ruestow's opinion was provided prior to Ms. McReynolds' effective treatment for hyperthyroidism. *Id*. at 31, 293.

By partially relying on the opinions of Dr. Vaidya and the state agency reviewing physicians, there was no evidentiary deficit, and the ALJ did not improperly substitute his judgment for that of a physician. Quite the contrary. The RFC determination limited Ms. McReynolds to a range of medium work that was more restrictive than suggested by Dr. Vaidya and the state agency physicians. The ALJ properly accepted portions of the opinion evidence, but also incorporated additional limitations to account for some of Ms. McReynolds' subjective symptoms. *See Cabrera v. Astrue*, 2011 WL 1526734, at *12 (N.D. Ill. 2011) ("Plaintiff is correct that [the RFC] is more restrictive than the state agency consultants' findings of no manipulative limitations whatsoever, but the ALJ fairly credited Plaintiff's testimony in that regard and modified the RFC assessment accordingly); *Dampeer v. Astrue*, 826 F.Supp.2d 1073, 1085 (N.D. Ill. 2011) (RFC was supported by substantial evidence where the ALJ "accepted alternate medical evidence and incorporated several additional limitations to give Claimant's subjective assessments the benefit of the doubt."). Because the ALJ did not draw any improper medical conclusions in

13

concluding that Ms. McReynolds is capable of a range of medium work, the Court rejects this argument as a basis for reversal and remand.

**6.**

Ms. McReynolds also contends that the ALJ should have sought an updated opinion from an independent medical expert who could have reviewed all of her medical records. Ms. McReynolds points out that in July 2018, Dr. Jeffrey Kramer, a neurologist, diagnosed her with neuropathy. (Doc. 23 at 11; R. 395). Peripheral neuropathy is nerve damage caused by chronically high blood sugar and can lead to numbness, loss of sensation, and sometimes pain in the feet, legs, or hands. It has been estimated that 60% to 70% of all people with diabetes eventually develop peripheral neuropathy, although not all suffer pain. Nerve damage is not inevitable. Nor does neuropathy necessarily result in a finding that a claimant is unable to perform work. *See, e.g., Leverenz v. Berryhill*, 691 F. App'x 445, 448 (9th Cir. 2017); *McCoy v. Astrue*, 648 F.3d 605, 608 (8th Cir. 2011); *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007); *Williams v. Barnhart*, 178 F. App'x 785 (10th Cir. 2006); *Long v. Astrue*, 2011 WL 721518, at *3 (E.D. Pa. 2011); *Gray v. Astrue*, 2010 WL 5479682, at *2 (W.D. Va. 2010). Studies have shown that people with diabetes can reduce their risk of developing nerve damage by keeping their blood sugar levels as close to normal as possible. *See Martinez v. Berryhill*, 2017 WL 2661625 (C.D.Cal. 2017); *Hardman v. Comm'r*, 2015 WL 869869, at *12 (E.D. Mich. 2015); https://www.webmd.com/diabetes/peripheral-neuropathy-risk-factors-symptoms#1.

The state agency physicians did not review Dr. Kramer's report. Thus, the ALJ gave the state agency physicians' finding of no severe impairments only partial weight, finding that Ms. McReynolds was *more limited*, based on her testimony and allegations of fatigue, tiredness, and weakness. (R. 30).

An ALJ is required to submit "new and potentially decisive" medical evidence that could "reasonably change the reviewing physician's opinion" to "medical scrutiny." *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Ms.

McReynolds does not explain how peripheral neuropathy of her lower extremities meant that she was unable to work, and she has not shown how a new diagnosis could reasonably change the previous functional opinions. Ms. McReynolds fails to cite to any medical evidence indicating that a peripheral neuropathy (of her lower extremities) resulted in any functional limitations. In fact, Dr. Kramer did not find any specific functional limitations resulting from Ms. McReynolds' peripheral neuropathy. As the ALJ indicated, Dr. Kramer's notes indicate that he observed Ms. McReynolds had normal gait and a negative Romberg test. (R. 394). A Romberg test is defined as "when a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed." *Gruettner v. Berryhill*, 2018 WL 4047121, at *3 n. 3 (E.D. Wis. 2018).

The ALJ further noted that although a physical therapy exam a month later on August 31, 2016 demonstrated reduced lower extremity strength, Ms. McReynolds, herself, reported that she was independent in bed mobility, car transfers, community ambulation, grooming, ambulation at home, stairs, toilet transfers, bathing, and dressing. (R. at 29, 411-12). On September 28, 2016, as the ALJ noted, Ms. McReynolds' treating physician observed normal exam results, including normal gait. *Id*. at 30, 444. Because Ms. McReynolds points to nothing in Dr. Kramer's record or subsequent records that suggest functional limitations that would qualify as significant and potentially dispositive, the court concludes that the ALJ's failure to submit Dr. Kramer's record to a medical expert for review does not require remand. *See Allen v. Astrue*, 2011 WL 3325841, at *12 (N.D. Ill. 2011) ("[a] mere diagnosis does not establish functional limitations, severe impairments, or an inability to work.").

### 7.

Second, Ms. McReynolds argues that the ALJ's RFC determination that she can perform the lifting requirements of medium exertional work is unsupported by substantial evidence. She asserts that the ALJ's RFC analysis was inadequate because he merely summarized the medical evidence and did not create a "logical bridge" between the evidence and his conclusion. We

15

disagree and find that the ALJ's determination that Ms. McReynolds is capable of lifting 25 pounds frequently and 50 pounds occasionally is supported by substantial evidence.

"The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011). Ms. McReynolds suggests that her obesity, diabetes, Graves' disease, and hypothyroidism are inconsistent with the ALJ's RFC determination that she can lift up to 50 pounds occasionally and 25 pounds frequently during a workday. Ms. McReynolds testified that she can only lift eight pounds. (R. 56). Of course, as we have shown, the ALJ was not required to accept at face value Ms. McReynolds' testimony. His function was to make determinations based upon the entire record. If it were otherwise, trials would be unnecessary, and ALJs would not be charged with the delicate task of making credibility judgments.

The ALJ sufficiently explained how he reached his RFC's lifting limitation. The ALJ found that Ms. McReynolds has the ability to perform the lifting requirements of medium exertional work based on Dr. Vaidya's consultative examination, which showed normal strength, normal range of motion, normal grip strength, normal ability to lift and carry, and no peripheral neuropathy, and the state agency physicians' finding that Ms. McReynolds had no severe impairments. *Id*. at 28, 30, 70-71, 77-78, 87-88, 95-96, 303-04. The ALJ noted that Dr. Matthews did not provide any specific functional limitations, including lifting restrictions, and did not contradict the lifting requirements of medium work in the RFC.[2] *Id*. at 30. Inconsistency between a diagnosis and a doctor's treatment notes is significant and properly factors into a credibility determination. *See* C*ohen v. Astrue*, 258 F. App'x 20, 27 (7th Cir. 2007); *Collins v. Barnhart*, 114 F. App'x 229, 233 (7th Cir. 2004); *Marshall v. Comm'r, Soc. Sec. Admin.*, 660 F. App'x 874, 876 (11th Cir. 2016).

---

[2] On July 28, 2016, Dr. Kramer assessed a "combination of neuropathy and probably OA" (osteoarthritis) and referred McReynolds to physical therapy for gait and balance. (R. 395). Dr. Kramer's assessment noted reduced tendon reflexes and abnormal sensory examination but contained no lifting restrictions. At a physical therapy consultation on August 31, 2016, McReynolds was found to have reduced strength in her bilateral lower extremities (not upper extremities). *Id*. at 411-12. McReynolds has not shown that the diagnosis of peripheral neuropathy of the lower extremities would affect her ability to lift.

The ALJ also noted that Dr. Ruestow's opinion was provided before the treatment of Ms. McReynolds' hyperthyroidism, which was effective in improving her symptoms. (R. at 293). Ms. McReynolds' suggestion that she is incapable of lifting 25 pounds frequently and 50 pounds occasionally is not supported by any medical evidence in the record apart from Dr. Ruestow's opinion which the ALJ reasonably discounted. Because the medical records, including those of Dr. Vaidya and the state agency reviewers, do not indicate that Ms. McReynolds needed greater lifting restrictions, substantial evidence supports the ALJ's lifting restriction.

## CONCLUSION

For the reasons and to the extent stated above, the ALJ's decision is affirmed. Plaintiff's Motion for Summary Reversal or Remand [22] is denied, and the Commissioner's Motion for Summary Judgment [30] is granted. The Clerk is directed to enter judgment in favor of the Commissioner of Social Security and against Elaine Ms. McReynolds.

**Jeffrey Cole**
**United States Magistrate Judge**

**Dated: 10/30/18**